# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| **JEFFREY M. SAYE,** | : |
| | : |
| **Plaintiff,** | : |
| | : |
| **v.** | :   **No. 3:03CV01071(DJS)** |
| | : |
| **OLD HILL PARTNERS, INC.,** | : |
| | : |
| **Defendant.** | : |

## MEMORANDUM OF DECISION

On June 18, 2003, Plaintiff, Jeffrey M. Saye ("Saye"),
commenced this action, alleging that Defendant, Old Hill
Partners, Inc. ("OHP") violated certain agreements under which
OHP was to repurchase Saye's shares in OHP and grant an option
for Saye to purchase stock in OHP thereafter. In the First and
Second Claims for Relief in the Complaint, Saye asks the court to
issue declaratory judgments, pursuant to 28 U.S.C. § 2201, with
regard to the appraisal of Saye's shares in OHP. Saye also
alleges breach of contract (Third Claim), unfair trade practices
in violation of Connecticut's Unfair Trade Practices Act
("CUTPA"), Conn. Gen. Stat. §§ 42-110a et seq.(Fourth Claim), and
breach of the implied covenant of good faith and fair dealing
(Fifth Claim).

In response to Saye's Complaint, OHP filed Defendant's
Amended Answer, Affirmative Defenses, Set-off and Counterclaim.
In its Amended Counterclaim, OHP has set forth seven claims: (1)

breach of contract (First Count); (2) breach of the duty of loyalty (Second Count); (3) breach of fiduciary duty (Third Count); (4) breach of Connecticut's Uniform Trade Secrets Act ("CUTSA"), Conn. Gen. Stat. §§ 35-51 et seq. (Fourth Count); (5) tortious interference with business relationships and expectancies (Fifth Count); (6) breach of CUTPA (Sixth Count); and (7) constructive trust (Seventh Count).  OHP's second and third affirmative defenses state that Saye has violated a confidentiality and non-compete agreement.  In these affirmative defenses, OHP asserts that Saye is not entitled to the remedies he seeks pursuant to the shareholder agreement, and that there has been a failure of consideration with regard to any transfer of shares to Saye and with regard to the alleged granting of an option to Saye.  Now pending are Defendant's Motion for Summary Judgment **(dkt. # 136)** and Plaintiff's Motion for Summary Judgment Dismissing Defendant's Counterclaim and Striking Affirmative Defenses **(dkt. # 141)**.  For the reasons stated herein, OHP's motion **(dkt. # 136)** is **DENIED**, and Saye's motion **(dkt. # 141)** is **GRANTED in part and DENIED in part**.

# I. FACTS[1]

Saye is a natural person who resides in California.  OHP is a closely-held corporation, formed by John Howe ("Howe"), that is organized in Delaware with its principal place of business in Darien, Connecticut.  OHP serves as an unregistered investment advisor, a hedge fund manager, and a general partner of certain investment funds.  Howe formed OHP to operate as the management company that runs a hedge fund named Footbridge Capital LLC ("Footbridge").  On February 1, 2000, Saye began working at OHP as a fund manager, whereby he was responsible for certain OHP investments.  At the commencement of Saye's employment, Saye and the shareholders of OHP, Howe and Mark A. Samuel, executed the "Old Hill Partners Inc. Shareholder Agreement" ("Shareholder Agreement"),[2] which set forth the rights and obligations of parties owning shares in OHP.  The Shareholder Agreement provided that Saye would receive a 15% equity interest in OHP, which would indefeasibly vest at 5% increments on December 1, 2000,

---

[1] Both Saye and OHP have pending motions for summary judgment.  Although both motions deal with, in general, Saye's relationship with OHP, the facts integral to the analysis of one motion are not necessarily integral to the analysis of the other.  OHP's motion seeks summary judgment with regard to Saye's claims, which, for the most part, implicate the buy-back of shares he owned in OHP.  Saye's motion seeks summary judgment with regard to the allegations in OHP's counterclaim and to strike OHP's affirmative defenses, which, for the most part, implicate Saye's conduct during and after his employment with OHP.  For the sake of clarity, the court has separated the factual discussion into two sections, the first of which is central to OHP's motion, the second of which is central to Saye's motion.

[2] For reasons not divulged in the record, the Shareholder Agreement is back-dated to December 15, 1998.

October 1, 2001, and August 1, 2002, so long as Saye remained employed at OHP on those dates.  Saye and OHP also executed the "Summary of Terms," which granted Saye an option to purchase an additional 5% equity interest in OHP at the price of $250,000 if OHP's assets under management were valued at $80,000,000 prior to February 1, 2001, the first anniversary of Saye's employment with OHP.  In addition, Saye and OHP executed an "Employee Confidentiality and Non-Compete Agreement" ("Confidentiality/Non-Compete Agreement"), in which Saye covenanted that during the period of his employment and for six months following his termination, he would not, for any reason, accept employment with, or in any other manner agree to provide, for compensation, services for any other person or entity that competes with OHP within the geographic radius of fifty miles of New York City.  Saye further covenanted that he would not materially disrupt or interfere with OHP's business for the same period of time (i.e., six months), and that he would not, for a period of two years following his termination, use or disclose OHP's "trade secrets" or proprietary or confidential information.

## A. THE BUY-BACK OF SAYE'S SHARES

Included in the Shareholder Agreement were provisions describing how OHP was to buy back vested shares from a shareholder-employee following the termination of that shareholder-employee's employment.  The length of that

shareholder-employee's employment determined which provision of the Shareholder Agreement governed OHP's buy-back of the shares. OHP terminated Saye's employment on March 31, 2002. Thus, based on the length of his employment at OHP, the parties agree that OHP's buy-back of Saye's shares was governed by Paragraph 3.8(c)(iii) of the Shareholder Agreement, which states:

> If a Shareholder-Employee leaves after twenty-four months (24) of employment, such person shall be paid the per Share price as determined by an appraiser selected (and paid) by the Company. If the Shareholder-Employee disagrees with such appraised Share valuation, such person may engage, at its [sic] own expense, a qualified third party appraisal[3] agreed to in advance by the Company.

(Dkt. # 1, Compl., Ex. A ¶ 3.8(c)(iii).)

According to Saye, his termination triggered certain vested rights that he held pursuant to the Shareholder Agreement and the Summary of Terms. Saye claims that, because he had been employed with OHP beyond October 1, 2001, OHP was obligated to pay him, within 180 days of the termination of his employment,[4] a price per share as determined by an appraisal provided by OHP. If Saye did not agree with OHP's appraisal, he was permitted to engage a

---

[3]The words "appraiser" and "appraisal" appear to be used interchangeably here. The court notes that, within the context of the Shareholder Agreement, this interchange of words has no significance. It is clear that the Shareholder Agreement, when stating that Saye may engage a "third party appraisal," means that Saye may hire a third-party evaluator (an "appraiser") to conduct an evaluation (an "appraisal"), and that, prior to the rendering of the appraisal, the parties would agree to the appraiser as being qualified.

[4]The Shareholder Agreements states that "[a]ll payments called for above shall be made . . . within 180 days of notice in the case of [Paragraph 3.8(c)(iii)]." (Dkt. # 1, Compl., Ex. A ¶ 3.8(c)(v).)

third party appraiser.  Saye asserts that OHP was obligated to compensate him for the 10% ownership interest he held pursuant to the Shareholder Agreement and for an additional 5% ownership interest pursuant to the option, which Saye claims he intended to exercise, contained in the "Summary of Terms."

Based on the submissions of the parties, the following events transpired subsequent to the termination of Saye's employment.  On August 29, 2002, OHP delivered to Saye a report prepared by Deloitte & Touche ("D&T Valuation"), which put the value of Saye's shares between $330,000 and $500,000.  Although the D&T Valuation was a report on the value of Saye's shares, Saye disputes the validity of the D&T Valuation.  OHP asserts that the D&T Valuation is a proper appraisal of Saye's shares; Saye, on the other hand, claims that because the D&T Valuation did not use proper methodologies or evaluations, it does not qualify as an "appraisal" under the Shareholder Agreement.  Saye specifically alleges in the Complaint that the D&T Valuation: (1) unfairly applied minority and liquidity discounts and an arbitrary median ratio adjustment in order to artificially reduce the value of his shares; (2) relied on inaccurate factual assumptions; and (3) inappropriately valued Saye's interest in OHP at 10% (the vested interest), rather than at 15% (the vested interest plus the 5% interest allowed pursuant to the option). Because of Saye's dissatisfaction with the D&T Valuation, he

decided to engage a third-party appraiser as provided for in the
Shareholder Agreement.

On October 11, 2002, Saye had initially proposed using
either PriceWaterhouseCoopers ("PWC") or Standard & Poors ("S&P")
as potential third-party appraisers.  On October 18, 2002, Howe,
the principal of OHP, and Edwin McKeever ("McKeever"), OHP's
controller, met with Allen Hahn ("Hahn"), an evaluation expert
with S&P, so that OHP would have to opportunity to evaluate the
qualifications of S&P and its representative (here, Hahn).  Saye
subsequently decided that he did not want to use PWC, but that he
wanted to engage S&P as the appraiser.  On October 23, 2002, Saye
notified OHP of his decision and requested OHP's consent to use
S&P as a third-party appraiser.  OHP responded by requesting that
Saye propose other appraisers in addition to S&P because OHP
believed that it was entitled to "a meaningful choice" between
appraisers.  Saye responded to OHP's request by stating that the
Shareholder Agreement does not call for OHP to have such "a
meaningful choice"; rather, Saye asserted that OHP could only
reject S&P if OHP found that S&P was not a "qualified" third
party appraiser as required by the Shareholder Agreement (i.e.,
that S&P lacked the requisite skills to perform the appraisal,
had a poor reputation for its business evaluation practice, or
was, for some reason, biased in such a way that it could not make
an unbiased appraisal).  Otherwise, Saye claimed, OHP was

obligated to approve his choice of appraisers.  Although he
initially informed OHP that he wanted S&P to perform his
appraisal, Saye, after he filed this lawsuit, obtained his
appraisal from a different company, Valuation Research Corp.
("VRC").  Apparently, Saye wished to continue working with Hahn,
who, subsequent to his meeting with Howe and McKeever, had left
S&P and joined VRC.  Saye maintains that Hahn was the best choice
as an appraiser because Hahn had previously consulted with Saye,
had been interviewed by OHP, and had become familiar with the
issues here.  Saye also maintains that he wanted to continue
using Hahn because of Hahn's reputation and experience in the
appraisal industry.  Additionally, Saye claims that there is no
substantive difference between the appraisal Hahn would have done
at S&P and the appraisal Hahn did do at VRC.

     OHP objects to Saye's use of VRC's appraisal as a breach of
the Shareholder Agreement because Saye did not afford OHP "a
meaningfule choice" among appraisers, OHP did not approve of VRC
as a third-party appraiser, and VRC is not the original company
that Saye indicated he wanted to use.  Saye counters OHP's
objections by claiming that OHP's actions, which included not
approving (or outright disapproving) his choice of appraisers and
not providing Saye with the information he needed to conduct his
own appraisal, constituted a breach of the Shareholder Agreement,
which made it both impossible for him to strictly follow the

procedures set forth therein and necessary for him to retain Hahn. Saye also maintains that OHP has delayed the resolution of the appraisal of his shares because OHP wanted to deprive Saye of funds in order to impede his ability to compete with OHP. In addition, Saye claims that OHP, in an attempt to hinder competition from Saye by discouraging potential clients from doing business with Saye, has advised at least one, if not more, of Saye's potential clients and investors that Saye is in violation of his duties to OHP.

B. SAYE'S CONDUCT DURING AND AFTER HIS EMPLOYMENT WITH OHP

Both during and after Saye's employment with OHP, Saye was involved in certain business affairs that affected his relationship with OHP, which maintains that Saye's conduct during these affairs were breaches of Saye's obligations to OHP. Saye contends that his conduct in no way violated his duties to OHP. The relevant facts are as follows:

1. Incidents During Saye's Employment with OHP

In the fall of 2000, Saye had a meeting with Luke Imperatore ("Imperatore") and Jeff Marron ("Marron"), whose organization, JBM Capital, was under contract to perform marketing services for OHP. At that meeting, Saye, Imperatore, and Marron discussed the possibility of starting their own hedge fund. According to OHP, Saye, Imperatore, and Marron intended to use "a strategy which was developed at OHP." OHP contends that this strategy was based

-9-

on Saye's improper disclosure of proprietary and confidential information to which Saye had access as a result of his employment with OHP. Despite this meeting, however, Saye, Imperatore, and Marron did not start a hedge fund together.

OHP maintains that, during the Summer of 2001, David Edington ("Edington"), who was an OHP investor interested in expanding his own hedge fund, Rimrock Capital Management, Inc. ("Rimrock"), told Howe that he wanted to learn about OHP's "back office operations." Howe spoke with Saye about Edington's request. According to Howe, Saye, who had worked with Edington in the past, spoke favorably of Edington. OHP contends that Howe was concerned about letting Edington learn about OHP's allegedly confidential and proprietary information because Edington could later duplicate OHP's operation and compete with it. OHP states that "Edington assured Howe that he had no intention of competing with OHP." In addition, OHP states that "Edington was given information which Howe would never have released to a prospective competitor" and that "Howe authorized the release of the information based on Edington's assurances that he would not share the information with anyone else or use the information to compete with OHP."

OHP also maintains that Saye's performance at OHP worsened over time. OHP states that its business required detailed and sophisticated analyses of the credit structures of potential

investments.  OHP contends that Saye initially performed such exhaustive analyses, but starting in the latter half of 2001, when the relationship between Saye and OHP was deteriorating, Saye "made investments based on minimal investigations" and started ignoring OHP policy regarding the "marking" of bonds. Investment managers, such as OHP, periodically issue statements that update the listed value of individual securities held in their portfolios based on current market conditions.  This evaluation process is called "marking to market."  In its portfolio, OHP held a bond known as First Berkshire ("FIRBER"), a fixed-income instrument that was not traded on a securities exchange or on NASDAQ.  In January 2002, Saye marked the FIRBER bond as having a value of 72.  OHP contends that 72 was an unreasonably high value for the FIRBER bond.  According to OHP, Saye ignored OHP's policy with regard to marking to market and mis-marked the FIRBER bond.

OHP points out other "minimal investigation" situations involving Saye that occurred in 2001 and 2002.  For example, Saye purchased bonds offered by Enron, Inc. ("Enron") through the Osprey partnership.  As Saye, OHP, and the rest of the world would later find out, Enron was implicated in less-than-honest business practices; indeed, Enron was accused of massive fraud and subsequently became involved in one of the largest bankruptcies in the history of the United States.  OHP maintains

that Saye purchased these Osprey bonds without adequately investigating them. OHP also maintains that other bond purchases by Saye lacked due diligence. With the purchase of the FIRBER bond, OHP claims that Saye did not fully understand the collateral that backed it and that he did not "hedge the purchase." With the purchase of the so-called CWALT bonds, OHP claims that Saye did not analyze the underlying credit structure, which would have made him aware of the bonds' true value. Finally, with the purchase of the so-called SAMI bonds, OHP claims that Saye ignored relevant information and overpaid.

2. Incidents After Saye's Employment with OHP

After Saye's employment with OHP ended, he moved to California. OHP believes that, after the termination of his employment, Saye conducted himself in a way that violated his obligations to OHP. First, OHP contends that Saye called Warren Wright ("Wright") of Northwater Capital Management, Inc. ("Northwater"), which was OHP's largest investor. According to OHP, Saye called Wright at least two times; during one of those calls, Saye told Wright that he intended to start his own investment firm, which "would target similar strategies to what he [Saye] did for . . . [OHP's fund] . . . ." Second, OHP contends that Saye contacted Jonathan Berg ("Berg") of Nighthawk Partners, Inc., a broker-dealer that produced investors for OHP. According to OHP, Saye notified Berg of his departure from OHP,

and soon thereafter several investors that Berg had produced for OHP redeemed their investments with OHP. Third, OHP contends that, in September 2002, Saye called Stephen Hamilton ("Hamilton") of Hamilton Miller Investments, LLC ("HMI"), which was an OHP investor. According to OHP, Saye told Hamilton that he was starting his own fund, called Tranquility Fund ("Tranquility"), and asked if he could meet Hamilton to discuss the possibility of HMI investing in Tranquility.

OHP further claims that after Saye left OHP, he "began an affiliation with Rimrock, in competition with OHP." Saye admits that he was a friend and colleague of Edington, Rimrock's owner, and that after he moved to California, Rimrock, which was also located in California, provided him with e-mail access and allowed him to use a desk on its premises. Saye contends that he received no compensation from Rimrock, and he thus never worked with Rimrock in competition with OHP. OHP maintains otherwise. According to OHP, Saye recommended fixed-income bonds to Rimrock, and in January 2004, Saye "attended a breakfast meeting in New York City at which Catherine Banat of C-3 Capital (an organization which was performing marketing services for Rimrock) introduced Edington to a potential investor." OHP also asserts, for example, that, while Saye was still employed with OHP, he became familiar with so-called Luz Solar bonds, which were available through the investment banking firm Allison-Williams

Co. ("Allison-Williams").  OHP states that the Luz Solar bonds
were thinly traded, i.e., that there was a limited number of
sellers and potential buyers for these bonds.  OHP initially
purchased some Luz Solar bonds.  According to OHP, Howe notified
Dave Tengdin ("Tengdin") of Allison-Williams that OHP was
interested in purchasing additional Luz Solar bonds in the
secondary market.  OHP claims, however, that after Saye left OHP
and during Saye's "affiliation" with Rimrock, Saye introduced
Chris Chester of Rimrock to Tengdin.  OHP further claims that,
when additional Luz Solar bonds became available, Rimrock
purchased the bonds, thereby increasing the price at which they
could have been purchased by OHP.

Finally, OHP states that, in October 2002, Saye started his
Tranquility Fund.  OHP maintains that Tranquility directly
competed with OHP and used significant portions of OHP's
proprietary investment strategies.  In addition, OHP claims that
around the same time Saye started Tranquility, he solicited OHP
investors.  OHP asserts that the "[s]tarting of his competitive
fund, of necessity[,] involved significant planning and document
production which Saye must have engaged in and arranged for
during the six months during which he agreed he would not compete
with OHP."

## II. DISCUSSION

There are two motions for summary judgment pending before the court, OHP's and Saye's.  The court will first analyze OHP's motion for summary judgment, which is directed at Saye's claims in the Complaint.  The court will then analyze Saye's motion for summary judgment, which is directed at the allegations in OHP's counterclaim and at OHP's affirmative defenses.

### A. SUMMARY JUDGMENT STANDARD

A motion for summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

Summary judgment is appropriate if, after discovery, the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "The burden is on the moving party 'to demonstrate the absence of any material factual issue genuinely in dispute.'" American Int'l Group, Inc. v. London Am. Int'l Corp., 664 F.2d 348, 351 (2d Cir. 1981) (quoting Heyman v. Commerce & Indus. Ins. Co., 524 F.2d 1317, 1319-20 (2d Cir. 1975)).

A dispute concerning a material fact is genuine "'if

evidence is such that a reasonable jury could return a verdict
for the nonmoving party.'" Aldrich v. Randolph Cent. Sch. Dist.,
963 F.2d 520, 523 (2d Cir. 1992) (quoting Anderson v. Liberty
Lobby, Inc., 477 U.S. 242, 248 (1986)).  The Court must view all
inferences and ambiguities in a light most favorable to the
nonmoving party.  See Bryant v. Maffucci, 923 F.2d 979, 982 (2d
Cir. 1991).  "Only when reasonable minds could not differ as to
the import of the evidence is summary judgment proper."  Id.

### B. DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

In its motion for summary judgment, OHP asks the court to
dismiss: (1) Saye's First and Second Claims for Relief
(declaratory judgment) because those claims are not ripe; (2)
Saye's Second Claim for Relief (breach of contract) because there
was no breach of contract; (3) Saye's Fourth Claim for Relief
(CUTPA) because the conduct described in the complaint is beyond
CUTPA's purview; and (4) Saye's Fifth Claim for Relief (breach of
the implied covenant of good faith and fair dealing) because it
was Saye, not OHP, who failed to act in good faith.  The court
shall address these claims in turn.

### 1. First and Second Claims: Declaratory Judgment

In the First Claim for Relief, Saye contends that his
appraisal should control here, whereas OHP contends otherwise.
Saye thus asks the court to issue, pursuant to 28 U.S.C. § 2201,
a declaratory judgment determining which party is correct, or, in

the alternative, determining the value of Saye's shares in OHP. In the Second Claim for Relief, Saye states that OHP contends that the D&T Valuation is an appropriate appraisal under the Shareholder Agreement, whereas Saye contends otherwise. Saye thus asks the court to issue, pursuant to 28 U.S.C. § 2201, a declaratory judgment determining which party is correct. OHP maintains that the court has no subject matter jurisdiction over Saye's First and Second Claims because they are premature (i.e., not ripe). OHP claims that the procedure set forth in the Shareholder Agreement has not been completed, and until OHP rejects the opinion of an approved third-party appraiser, there is no ripe, justiciable issue before the court. As a result, OHP asks the court to dismiss these claims.

"'Ripeness' is a term that has been used to describe two overlapping threshold criteria for the exercise of a federal court's jurisdiction." Simmonds v. I.N.S., 326 F.3d 351, 356-57 (2d Cir. 2003). The first criterion with regard to ripeness is the constitutional requirement. "'Ripeness is a constitutional prerequisite to [the] exercise of jurisdiction by federal courts.'" United States v. Fell, 360 F.3d 135, 139 (2d Cir. 2004) (quoting Nutritional Health Alliance v. Shalala, 144 F.3d 220, 225 (2d Cir. 1998)). As the Second Circuit has noted with regard to "constitutional ripeness,"

> At the core of the ripeness doctrine is the necessity of "ensur[ing] that a dispute has generated injury

-17-

significant enough to satisfy the case or controversy
requirement of Article III of the U.S. Constitution" by
"prevent[ing] a federal court from entangling itself in
abstract disagreements over matters that are premature
for review because the injury is merely speculative and
may never occur."

Id. (quoting Dougherty v. Town of N. Hempstead Bd. of Zoning
Appeals, 282 F.3d 83, 90 (2d Cir. 2002)). "Constitutional
ripeness is a doctrine that, like standing, is a limitation on
the power of the judiciary. It prevents courts from declaring the
meaning of the law in a vacuum and from constructing generalized
legal rules unless the resolution of an actual dispute requires
it." Simmonds, 326 F.3d at 357.

Here Saye requests that the court settle his dispute with
OHP by issuing two declaratory judgments, which the court may do
pursuant to the Declaratory Judgment Act. See 28 U.S.C. §
2201(a). "The standard for ripeness in a declaratory judgment
action is that 'there is a substantial controversy, between
parties having adverse legal interests, of sufficient immediacy
and reality to warrant the issuance of a declaratory judgment.'"
Duane Reade, Inc. v. St. Paul Fire and Marine Ins. Co., 411 F.3d
384, 388 (2d Cir. 2005) (quoting Maryland Cas. Co. v. Pac. Coal &
Oil Co., 312 U.S. 270, 273 (1941)). "In order to decide whether
to entertain an action for declaratory judgment, [the Second
Circuit has] instructed district courts to ask: (1) whether the
judgment will serve a useful purpose in clarifying or settling
the legal issues involved; and (2) whether a judgment would

finalize the controversy and offer relief from uncertainty." Id. at 389.

The second criterion with regard to ripeness is the prudential requirement.  In addition to being a constitutional prerequisite, ripeness is a prudential determination in which the court asks "(1) whether an issue is fit for judicial decision and (2) whether and to what extent the parties will endure hardship if decision is withheld." Simmonds, 326 F.3d at 359; see Abbott Labs. v. Gardner, 387 U.S. 136, 148-49 (1967).  In contrast to when a court finds that a case is not constitutionally ripe, "when a court declares that a case is not prudentially ripe, it means that the case will be *better* decided later and that the parties will not have constitutional rights undermined by the delay." Simmonds, 326 F.3d at 357 (emphasis in original).  The rules governing this doctrine are "more mutable and more responsive to fact-intensive inquiries into context than constitutional ones." Id.  "Prudential ripeness is, then, a tool that courts may use to enhance the accuracy of their decisions and to avoid becoming embroiled in adjudications that may later turn out to be unnecessary or may require premature examination of, especially, constitutional issues that time may make easier or less controversial." Id.

The court finds Saye's First and Second Claims for declaratory judgment to be ripe for review.  With regard to

"constitutional" ripeness, the court must determine whether a judgment will both serve a useful purpose in clarifying or settling the legal issues involved and finalize the controversy and offer relief from uncertainty. There is an obvious dispute in this case about how the Shareholder Agreement is to be enforced. Saye contends that he has followed the provisions of the Shareholder Agreement to the point where OHP made it impossible for him to continue to do so. OHP insists that Saye did not follow the provisions of the Shareholder Agreement. Specifically at issue is the question, which is not answered by the Shareholder Agreement itself, of the engagement of an "agreed to" third-party appraiser. Saye insists that OHP must either approve or disapprove of his appraiser, and if OHP disapproves, it must be for a lack of skill, inadequate reputation, or bias. OHP insists that it is not required to either approve or disapprove Saye's appraiser until Saye presents to OHP "a meaningful choice" of appraisers. In addition, Saye insists that the D&T Valuation is not a proper appraisal under the Shareholder Agreement, whereas OHP insists that it is. If the court were to issue declaratory judgments on these issues, it would serve a useful purpose in settling this fundamental dispute between the parties and offering relief from uncertainty because the parties would have a clearer understanding of what their rights and obligations are under the Shareholder Agreement.

With regard to "prudential" ripeness, the court sees little benefit in delaying these claims for a later time. It does not appear that the parties' relative positions or contentions will change, and the court believes that withholding a decision now will only allow for the same or similar issues to rise again in the future. As noted above, this case is fit for a judicial decision. To the extent the parties will endure hardship if a decision is withheld, Saye would endure an obvious financial hardship because the amount of the payment owed to him, at least in part, is contingent on the decision in this case. OHP's hardship might not be as great, as OHP is the payor, not the payee, but a decision here could still save OHP the time and trouble of a future lawsuit regarding the same disputes.

Even considering, then, both aspects (constitutional and prudential) of the ripeness doctrine, the court finds OHP's argument unpersuasive. OHP claims that Saye should be required to "use the [Shareholder] Agreement's procedure" before seeking a declaratory judgment. That is to say, OHP asserts that these claims are unripe because Saye did not follow the proper procedure, i.e., no "approved" third-party appraiser was ever appointed. OHP states that "[u]ntil Saye has followed the [Shareholder] Agreement's procedure . . ., and until OHP has refused to pay Saye for his stock as valued by an approved third party appraiser, there is no justiciable dispute for the Court to

resolve." OHP's argument is flawed, though, as Saye maintains he did follow the proper procedure and that OHP did not, whereas OHP claims the opposite. Thus, whether Saye or OHP actually followed the proper procedure under the Shareholder Agreement in the first place is a central issue to this case.

The court sees another troublesome aspect with OHP's argument. Under the Shareholder Agreement, there is no express language setting forth how or why OHP should approve of a third-party appraiser. OHP believes that it is entitled to "a meaningful choice," although such language is also not in the Shareholder Agreement. Because OHP did not believe that Saye gave it "a meaningful choice," it refused to approve or disapprove of Saye's appraisers. OHP obviously believes that it is entitled to withhold its approval (or disapproval) of an appraiser. The court, though, fails to see how OHP's non-approval or non-disapproval of an appraiser is a failure by Saye to follow the Shareholder Agreement's procedure. In addition, if OHP were entitled to withhold its decision on a third-party appraiser, it is conceivable that OHP could try to do so indefinitely, the result of which, if the court were to follow OHP's reasoning, would be that Saye's claims could never be ripe. OHP cannot assert that Saye's claim is unripe because no approved third-party appraiser was appointed when OHP, who has the power of approval, will not exercise that power. Consequently, with

regard to Saye's First Claim and Second Claim, OHP's motion for summary judgment is **DENIED.**

### 2. Third Claim: Breach of Contract

In the Third Claim for Relief, Saye contends that OHP breached its obligations pursuant to the Shareholder Agreement.[5] OHP insists that Saye was not paid for his shares under the Shareholder Agreement "because he elected not to accept OHP's offer of payment based on the D&T Valuation, and because no approved third party appraiser has ever been appointed in accordance with paragraph 3.8(c)(iii)." According to OHP, "OHP never prevented Saye from obtaining a third party appraisal, and never refused to approve of S&P to serve as the third party appraiser."

In Connecticut, "The elements of a breach of contract action are the formation of an agreement, performance by one party, breach of the agreement by the other party and damages." Bross v. Hillside Acres, Inc., 92 Conn. App. 773, 780 (2006) (internal quotation marks omitted). "Whether there was a breach of contract is ordinarily a question of fact." Town of Ridgefield v. Eppoliti Realty Co., Inc., 71 Conn. App. 321, 338 (2002). Saye claims that he has followed the terms of the Shareholder Agreement, whereas OHP insists that Saye has not conformed to the

---

[5]The court notes that Paragraph 7.3 of the Shareholder Agreement states: "This Agreement shall be governed by and construed in accordance with the laws of Connecticut applicable to contracts made and to be performed in that State." (Dkt. # 1, Compl., Ex. A ¶ 7.3).

contract's terms. There is, then, a factual dispute as to whether Saye's or OHP's conduct constitutes a material breach of the Shareholder Agreement.

In addition, this factual dispute arises from the unclear meaning of the Shareholder Agreement's provision regarding OHP's approval of a third-party appraiser. The Shareholder Agreement only mentions that Saye could hire "a qualified third party appraiser agreed to in advance" by OHP; however, the contract does not define the term "qualified," mention "a meaningful choice" (which, according to OHP, should be read into the agreement), or set forth the terms under which OHP could (or should) approve or disapprove of an appraiser. These various issues preclude the granting of summary judgment for this claim. "[I]n a contract dispute, summary judgment may be granted only where the language of the contract is unambiguous." Bouzo v. Citibank, N.A., 96 F.3d 51, 58 (2d Cir. 1996) (internal quotation marks omitted). "If the language is susceptible to different reasonable interpretations, and where there is relevant extrinsic evidence of the parties' actual intent, then the contract's meaning becomes an issue of fact precluding summary judgment." Sayers v. Rochester Tel. Corp. Supplemental Management Pension Plan, 7 F.3d 1091, 1094 (2d Cir. 1993) (internal quotation marks omitted). There are various factual issues in dispute here, and OHP's motion for summary judgment with regard to Saye's Third

Claim is **DENIED**.

### 3. Fourth Claim: CUTPA

_____In the Third Claim for Relief, Saye contends that OHP has violated Connecticut's Unfair Trade Practices Act "[b]y reason of OHP's unfair and deceptive conduct." OHP claims that CUTPA does not apply to the conduct alleged here. More specifically, OHP contends that CUTPA does not apply to the facts in this case because OHP's alleged conduct here was merely "incidental" to OHP's primary trade or commerce as an investment advisor/hedge fund manager, and because Saye's relationship with OHP is not subject to review under the statute as "trade or commerce."

"CUTPA, by its own terms, applies to a broad spectrum of commercial activity." Larsen Chelsey Realty Co. v. Larsen, 232 Conn. 480, 492 (1995). CUTPA provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b(a). "Trade or commerce . . . is broadly defined as 'the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value in this state.'" Larsen Chelsey Realty Co., 232 Conn. at 492 (quoting Conn. Gen. Stat. § 42-110a(4)). With regard to an employer/employee relationship, which may exist for the purposes

of promoting trade or commerce, "the actual employment relationship is not itself trade or commerce for the purpose of CUTPA." <u>Quimby v. Kimberly Clark Corp.</u>, 28 Conn. App. 660, 670 (1992) (internal quotation marks omitted). On the other hand, if a plaintiff's "allegations lie outside the narrow confines of the employer-employee relationship[,] . . . [they] may constitute a violation of CUTPA." <u>Larsen Chelsey Realty Co.</u>, 232 Conn. at 494. "The entire act is remedial in character . . . and must be liberally construed in favor of those whom the legislature intended to benefit." <u>Id.</u> (internal quotation marks and citations omitted).

With regard to establishing a CUTPA violation, the Connecticut Supreme Court has stated the following:

> It is well settled that in determining whether a practice violates CUTPA we have adopted the criteria set out in the cigarette rule by the federal trade commission for determining when a practice is unfair: (1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise-in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, [competitors or other businesspersons]. . . . All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three.

<u>Ventres v. Goodspeed Airport, LLC</u>, 275 Conn. 105, 155 (2005)

(internal quotation marks omitted).  CUTPA, however, "imposes no requirement of a consumer relationship."  Larsen Chelsey Realty Co., 232 Conn. at 496.  Thus, because "CUTPA is not limited to conduct involving consumer injury[,] . . . a competitor or other business person can maintain a CUTPA cause of action without showing consumer injury."  Id.

Based upon the language of CUTPA and the standards set forth by the Connecticut courts, the court cannot find that Saye's CUTPA claim fails as a matter of law.  OHP's first argument, that the alleged conduct here was only "incidental" to OHP's trade or commerce, is unpersuasive.  OHP is an investment advisor that allegedly took certain actions, including delaying the resolution of the appraisal and maligning Saye to potential clients and investors, designed to impede the business and clientele of a competitor, i.e., Saye.  Such actions fit squarely within the provenance of CUTPA.  See Fink v. Golenbock, 238 Conn. 183, 212 (1996) (holding that defendant's actions in attempting to usurp the business and clientele of one corporation in favor of another fall under CUTPA).  OHP's second argument, that Saye's relationship with OHP is not subject to review under CUTPA, is equally unpersuasive.  "[I]t [is] not the employment relationship that [is] dispositive, but the defendant's conduct."  Id. at 214.  The above-mentioned alleged conduct goes beyond the confinement

of Saye's employment at OHP,[6] as it was presumably for the purpose of hindering competition from Saye himself.

OHP further argues that the only evidence to which Saye cites in support of his CUTPA claim is the testimony of Imperatore, who apparently worked for OHP. Imperatore's testimony, though, is sufficient to support Saye's CUTPA claim for the purposes of this motion. For example, Imperatore's testimony regarding what members of OHP told investors about Saye's termination could support Saye's CUTPA claim:

> Q.   I want to know what your recollection is about what Howe told investors concerning Saye's termination. I understand you can't give me a specific investor. I'm asking for what your recollection is generally about what Howe was saying to investors on that subject.
> A.   That Jeff [Saye] was fired. In some cases [Howe] said Jeff was—had mismarked the book. And then in—
> Q.   Had mismarked the book?
> A.   Yes.
> Q.   What does mismark the book mean?
> A.   Mispriced the book.
> Q.   The portfolio?
> A.   The portfolio. And then the following—I forget what year it was, maybe 2002, we had poor performance and we continually blamed the performance on Jeff [Saye], which I thought was a very big mistake.
>      . . . .

---

[6]The court points out that much of the wrongful conduct alleged here must have, in fact, occurred after the termination of Saye's employment with OHP, as the buy-back terms of the Shareholder Agreement only come into effect after the termination of the employer/employee relationship. The court further notes that, on the one hand, OHP wants the court to find that, when it comes to Saye's CUTPA claim, Saye's relationship with OHP is not subject to review under the statute (see dkt. # 137, Mem. Supp. Def.'s Mot. Summ. J., pp. 13-14), yet, on the other hand, OHP wants the court to find that this relationship is subject to review under the statute when dealing with OHP's CUTPA allegation (see dkt. # 156, Def.'s Am. Answer, Affirm. Defenses, & Countercls., p 17). OHP cannot have it both ways. The court shall not grant summary judgment with regard to Saye's CUTPA claim based on the argument that the relationship between Saye and OHP is not subject to review under CUTPA.

```
Q.   Was it your view that there was not an accurate
     statement to blame it on Jeff [Saye]?
A.   Well, I'm not sure accurate or not.  At some point you
     can't . . .
Q.   At some point you can't what, Mr. Imperatore?
A.   You can't blame it on anyone.
Q.   Why is that?
A.   Because it's your own book.
     . . . .
Q.   Did you tell investors that the poor performance was
     due to Mr. Saye?
A.   There were some—I think at the beginning there were
     some bonds in there that Jeff [Saye] had put in there
     which performed poorly, yes,
Q.   My question was did you yourself tell investors that
     the poor performance was due to Mr. Saye?
A.   Yes, yes, at the beginning, yes.
Q.   You yourself told investors that?
A.   Sure, yes.
Q.   At whose direction, if anyone's, did you do that?
A.   I think that was a joint kind of direction.  We all—we
     all felt that way.
     . . . .
Q.   And at what point did you begin to feel uncomfortable
     with taking that position?
A.   Well, once you get past, halfway through [sic] the year
     and the portfolio is still performing poorly, then you
     [sic]—it had a poor 12 months, you know.
```

(Dkt. # 149, Ex. 6, Imperatore Dep. at 96:5-25; 97:12-21; 98:7-25; 100:12-18.)  A trier of fact could glean from Imperatore's testimony that Howe attempted to malign Saye to other investors in order to impede competition from Saye.[7]  Consequently, OHP's

---

[7]OHP claims that Imperatore's testimony describes Howe's conduct in 2002, and for most of that year, Saye was bound by the Confidentiality/Non-Compete Agreement, wherein Saye agreed to not compete with OHP for six months following the termination of his employment.  OHP argues that because Saye did not have "the right to be competing" during this time, his CUTPA claim must fail.  The court finds this argument unpersuasive. First, the Confidentiality/Non-Compete Agreement states that, for six months following his termination from OHP, Saye shall not provide services for any other person or entity that competes with OHP anywhere within fifty miles of the geographical radius of New York City. The Confidentiality/Non-Compete Agreement does not say that Saye cannot compete with OHP at all during those six months.  Second, even if the court were to read the non-compete language

-29-

motion for summary judgment with regard to Saye's Fourth Claim is
**DENIED**.

4. Fifth Claim: Breach of the Implied
Covenant of Good Faith and Fair Dealing

In the Third Claim for Relief, Saye contends that OHP
breached the implied covenant of good faith and fair dealing by
intentionally and unreasonably reducing the value of Saye's
shares, refusing to agree to the appraiser chosen by Saye,
failing to provide Saye with certain information needed to
complete an appraisal, and otherwise failing to treat Saye
equally with other shareholders.  OHP contends that Saye, not
OHP, ignored the provisions of the Shareholder Agreement and
failed to act in good faith.

"Every contract carries an implied covenant of good faith
and fair dealing requiring that neither party do anything that
will injure the right of the other to receive the benefits of the
agreement." Gupta v. New Britain Gen. Hosp., 239 Conn. 574, 598
(1996) (internal quotation marks omitted).  "The covenant of good
faith and fair dealing presupposes that the terms and purpose of
the contract are agreed upon by the parties and that what is in
dispute is a party's discretionary application or interpretation
of a contract term."  De La Concha of Hartford, Inc. v. Aetna

---

as OHP wishes, the court is not convinced that OHP would be free to do or say
whatever it wanted regarding Saye during those six months.  By OHP's logic,
OHP could malign Saye, and possibly ruin his reputation ubiquitously, for six
months with impunity.  The court does not believe that this is permissible.

Life Ins. Co., 269 Conn. 424, 433 (2005) (internal quotation
marks omitted).  "To constitute a breach of [the implied covenant
of good faith and fair dealing], the acts by which a defendant
allegedly impedes the plaintiff's right to receive benefits that
he or she reasonably expected to receive under the contract must
have been taken in bad faith."  Id. (internal quotation marks
omitted).  As the Connecticut Supreme Court has noted,

> Bad faith in general implies both actual or
> constructive fraud, or a design to mislead or deceive
> another, or a neglect or refusal to fulfill some duty
> or some contractual obligation, not prompted by an
> honest mistake as to one's rights or duties, but by
> some interested or sinister motive. . . .  Bad faith
> means more than mere negligence; it involves a
> dishonest purpose.

Id. (internal quotation marks omitted).

Based on the various issues in dispute here, the court
cannot grant summary judgment on Saye's Fifth Claim in OHP's
favor.  OHP asserts that Saye, in fact, failed to act in good
faith with regard to his choosing a third-party appraiser by
first proposing two appraisers, withdrawing from consideration
one of the appraisers, and then refusing to give OHP additional
appraisers for consideration.  OHP further maintains that the
Shareholder Agreement's terms were complete and clear, and thus
Saye's claim must fail because the implied covenant of good faith
and fair dealing applies only where a contract is incomplete or
unclear.  OHP's assertions contradict themselves.  On the one
hand, OHP states that Saye violated the implied covenant of good

faith and fair dealing because he did not perform certain acts that, although not required by the terms of the Shareholder Agreement itself, should be read into the agreement. On the other hand, OHP maintains that the implied covenant of good faith and fair dealing does not apply here because the Shareholder Agreement is complete and clear. If the court were to accept OHP's second assertion, i.e., that the implied covenant does not apply here because the agreement is complete and clear, it then could not find that Saye violated the implied covenant by failing to act in a way that is not called for in the Shareholder Agreement.

There is a real dispute here as to which party has satisfied its obligations under the Shareholder Agreement because the Shareholder Agreement is not complete or clear with regard to the buying back of shares. The Shareholder Agreement contains no provisions describing the reasons for which OHP can disapprove of a proposed third-party appraiser, nor does it detail what the parties must do if OHP does not approve of any of the proposed third-party appraisers. In addition, although OHP maintains that "the opinion of the approved third party appraiser is binding," the Shareholder Agreement does not say this. Indeed, the Shareholder Agreement does not expressly say which appraisal is binding, nor does it provide the mechanisms for determining which appraisal controls when there is a difference between OHP's

appraisal and a third-party appraisal. Given these disputes
here, the court cannot grant summary judgment in favor of OHP.
OHP's motion for summary judgment with regard to Saye's Fifth
Claim is **DENIED**.

## C. PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

In his motion for summary judgment, Saye asks the court to
dismiss OHP's Amended Counterclaim and strike OHP's second and
third affirmative defenses.[8] In its Amended Counterclaim, OHP has
set forth seven claims: (1) breach of contract (First Count); (2)
breach of the duty of loyalty (Second Count); (3) breach of
fiduciary duty (Third Count); (4) breach of Connecticut's Uniform
Trade Secrets Act ("CUTSA"), Conn. Gen. Stat. §§ 35-51 et seq.
(Fourth Count); (5) tortious interference with business
relationships and expectancies (Fifth Count); (6) breach of CUTPA
(Sixth Count); and (7) constructive trust (Seventh Count). OHP's
second affirmative defense states that Saye has violated the
Confidentiality/Non-Compete Agreement, which is part of the
Shareholder Agreement, and therefore he is "not entitled to the
remedies he seeks pursuant to the Shareholder Agreement." OHP's
third affirmative defense states that because Saye has violated

---

[8]The court notes that Saye filed his motion for summary judgment prior
to the filing of Defendant's Amended Answer, Affirmative Defenses, Set-off and
Counterclaim. Thus, Saye's motion for summary judgment, and his memorandum in
support, refer to OHP's first responsive pleading, titled Defendant's Answer,
Special Defenses, Set-off and Counterclaim. OHP's amended pleading did not,
however, add any new affirmative defenses or claims. Consequently, the
court's analysis of Saye's motion for summary judgment would have been the
same regardless of which responsive pleading was in effect.

the Confidentiality/Non-Compete Agreement, which is part of the Shareholder Agreement, "there has been a failure of consideration with regard to any transfer of shares to Plaintiff and with regard to the alleged granting of an option to Plaintiff."  Saye asserts that OHP's Amended Counterclaim and affirmative defenses are without factual and legal support.  The court shall address these claims in turn.

### 1. First Count: Breach of Contract

In the First Count of the Amended Counterclaim, OHP contends that Saye's conduct violated the Shareholder Agreement and the Confidentiality/Non-Compete Agreement.[9]  Saye denies violating any contracts he had with OHP, and claims that OHP, in fact, violated the Shareholder Agreement.

The court has already set forth the Connecticut standard for breach of contract, see supra Part II.B.2, and will not repeat it here.  With regard to the buying back of shares as recounted in the Shareholder Agreement, the court found that there are genuine issues of fact as to whether OHP violated that agreement's terms.  See discussion supra Part II.B.2.  The court correspondingly finds that there are genuine issues of fact as to whether Saye violated the Shareholder Agreement.  Indeed, with regard to

---

[9]The court points out that, although the First Count of the Amended Counterclaim refers to the breach of both the Shareholder Agreement and the Confidentiality/Non-Compete Agreement, the briefs filed, either in support of or in opposition to OHP's summary judgment motion, concentrate solely on the Confidentiality/Non-Compete Agreement.

buying back of Saye's shares under the Shareholder Agreement, the same issues of fact apply to both motions for summary judgment, as it is not clear, because the language of the Shareholder Agreement is susceptible to different interpretations, whether Saye or OHP acted improperly. Therefore, with respect to the portion of the First Count of OHP's Amended Counterclaim that concerns the Shareholder Agreement, Saye's motion for summary judgment is **DENIED.**

With regard to the Confidentiality/Non-Compete Agreement, OHP has alleged that Saye violated the non-compete covenant by performing services for Rimrock. Saye argues that the Confidentiality/Non-Compete Agreement prohibited him from providing services only to those competitors of OHP that were located within a fifty-mile radius of New York City. Saye concludes that, because Rimrock was located in California, which is approximately "3000 miles from New York," he could not have violated the Confidentiality/Non-Compete Agreement. OHP, on the other hand, maintains that the Confidentiality/Non-Compete Agreement prohibited Saye from providing services to any competitor of OHP that conducted business within a fifty-mile radius of New York City. With respect to this non-compete covenant, the court agrees with Saye's interpretation.

The Confidentiality/Non-Compete Agreement states that Saye could not "[a]ccept employment with, or in any other manner agree

to provide, for compensation, services for any other person or entity that competes with [OHP] anywhere within a 50 mile radius of New York, New York." (Dkt. # 158, Ex. 1, Confidentiality/Non-Compete Agreement ¶ 6(a).) Given the pervasiveness of the Internet and telecommunication systems in our society, the court harbors many doubts about the usefulness of such a non-compete covenant, especially considering the nature of the business in which Saye and OHP were involved. Non-compete covenants are, however, valid under Connecticut law. Nevertheless, because of their restrictive effect on trade in the free market, see Deming v. Nationwide Mut. Ins. Co., 279 Conn. 745, 761 (2006), Connecticut courts have long recognized that non-compete covenants between employers and employees are subject to stricter review than other types of contracts, see Samuel Stores, Inc., v. Abrams, 94 Conn. 248, 253 (1919) ("Under the law, restrictive stipulations in agreements between employer and employé [sic] are not viewed with the same indulgence as such stipulations between a vendor and vendee of a business . . . . In a restrictive covenant between employer and employé [sic] . . . there is small scope for the restraint of the right to labor and trade and a correspondingly small freedom of contract.") (internal quotation marks omitted). Therefore, as non-compete covenants "may be against public policy, . . . [they] are enforceable only if their imposed restraint is *reasonable*."

<u>Deming</u>, 279 Conn. at 761 (emphasis added).  In assessing whether a non-compete covenant is reasonable, the court must consider: "(1) the employer's need to protect legitimate business interests, such as trade secrets and customer lists; (2) the employee's need to earn a living; and (3) the public's need to secure the employee's presence in the labor pool."  <u>Id.</u>

The parties disagree over how to read this non-compete covenant.  Saye believes that the covenant imposed a restriction based upon the physical locations of OHP's competitors, whereas OHP believes that the covenant imposed a restriction based upon where OHP's competitors conducted business.  The court understands how the parties could have reached their respective interpretations, as the language in the non-compete covenant is open to two meanings.  One could read the contract as stating that Saye could not provide services for any competitor of OHP located within a fifty-mile radius of New York City.  Alternatively, one could read the contract as stating that Saye could not provide services for any competitor of OHP that conducts any of its business operations within a fifty-mile radius of New York City.  It is not clear to the court which of these interpretations is definitive, as both are fair readings of the covenant.

In Connecticut, "[i]t is generally accepted . . . that when two . . . meanings may fairly be given to language in a contract,

the language is to be construed against the one who drew it;
. . . and likewise, the language of a contract is typically
construed most strongly against the party whose language it is
and for whose benefit it was inserted." Sturman v. Socha, 191
Conn. 1, 9 (1983) (internal citation omitted); see Ranciato v.
Nolan, No. CV970401729S, 2002 WL 313892, at *3 (Conn. Super. Ct.
Feb. 7, 2002) (stating that Connecticut has "long standing
doctrines which provide that contracts are to be construed
narrowly and against the drafter"); see also Vermont
Microsystems, Inc. v. Autodesk, Inc., 88 F.3d 142, 149 (2d Cir.
1996) ("Noncompetition agreements generally are construed
narrowly by courts . . . ."). Because the court has found that
two meanings may fairly be given to the language of the non-
compete covenant, and because non-compete covenants are to have
narrow scope, the court will construe that language against the
party who drafted that language and for whose benefit that
language was included, i.e., OHP.[10]  The court thus accepts Saye's
interpretation of the non-compete covenant as controlling here.

_____

[10]The court points out that the analysis of Saye's alleged breach of the
non-compete covenant here differs from the analysis of OHP's alleged breach of
the Shareholder Agreement, see supra Part II.B.2, because of the differences
in the types of ambiguities presented.  In the Shareholder Agreement, certain
words themselves have no readily ascertainable meaning to the court, thus
precluding summary judgment.  In the non-compete covenant, there is no
confusion regarding what the words themselves mean, i.e., what the words'
definitions are.  Rather, the ambiguity is related to how one should read and
interpret the non-compete covenant as a whole.  This latter type of ambiguity,
which here has opened the non-compete covenant to two different
interpretations, was caused by the covenant's imprecise sentence structure.
Because OHP, as the drafter, created the language in the non-compete covenant,
the court is more willing to construe ambiguities caused by imprecise sentence
structure against OHP rather than against Saye.

The court considers its construal of the non-compete covenant's language to be the narrower and more reasonable interpretation.  Under the court's interpretation, Saye's ability to compete with OHP is burdened with only a reasonable physical limitation, namely, a restriction on providing services to any competitor of OHP located within a fifty-mile radius of New York City.  Under OHP's interpretation, on the other hand, Saye could be physically located in California (or China, for that matter), yet still be restricted from providing his services to any competitor of OHP, no matter where its location, that conducts business in the greater New York area.  In the court's estimation, OHP's interpretation, in both its geographical area and its restraint on Saye's ability to pursue his career, is not reasonably limited in scope.  The court thus finds that the non-compete covenant prohibited Saye from providing services to a competitor of OHP whose physical location was within a fifty-mile radius of New York City.  Therefore, even assuming that Saye competed with OHP by performing services for Rimrock, OHP's claim here fails.  Based on all the materials submitted to the court, Rimrock is located in California, which is well beyond the fifty-mile radius of New York City, and there is no other evidence that Saye performed services for any other person or entity located with a fifty-mile radius of New York City.  Consequently, with respect to the portion of the First Count of OHP's Amended

Counterclaim that concerns the non-compete covenant in the Confidentiality/Non-Compete Agreement, Saye's motion for summary judgment is **GRANTED.**

Saye further contends that he did not violate the provisions of the Confidentiality/Non-Compete Agreement that prohibit him from "[m]aterially disrupt[ing], damag[ing], impair[ing] or interfer[ing] with the business of [OHP], whether by way of interfering with or soliciting its employees, disrupting its relationship with customer[s], agents, representatives or vendors, or otherwise." (Dkt. # 158, Ex. 1, Confidentiality/Non-Compete Agreement ¶ 6(b).) Saye claims that, "[o]ther than Edington, with whom he was in regular communication," in the six months following his termination, he contacted only a single investor of OHP and one individual who had previously worked for OHP as an independent marketer. The court finds, though, that there are sufficient factual questions here to preclude summary judgment. First, there is a question of whether Saye assisted Rimrock in purchasing, to OHP's detriment, the Luz Solar bonds. By saying "other than Edington," Saye seems to imply that OHP needs to demonstrate other incidents of potential wrongful activity, which it need not do. Second, there is a question of whether Saye's contacting Wright, Berg, or Hamilton in any way violated the Confidentiality/Non-Compete Agreement. Although Saye maintains that his communications with

these people were appropriate, that he never disparaged OHP, and
that his conduct did not "materially" disrupt or interfere with
OHP's business, there is testimony to the contrary to which a
finder of fact could give weight. (See dkt. # 152, Ex. A, Howe
Dep. at 341-49.) Consequently, with regard to the portion of the
First Count of OHP's Amended Counterclaim that concerns the
prohibition against disrupting OHP's business, Saye's motion for
summary judgment is **DENIED.**

  2. Second and Third Counts: Duty of Loyalty and Fiduciary Duty

        In the Second Count of the Amended Counterclaim, OHP claims
that "[a]s [OHP's] employee, [Saye] owed [OHP] a duty of
loyalty," which "included the duty to deal with [OHP] honestly
and fairly, to accurately apprise [OHP] of any situations that
could cause its assets to lose value, to properly manage and
account for the value of assets for which [Saye] had
responsibility as portfolio manager, and to honor the terms of
the agreements he entered with OHP."  In the Third Count of the
Amended Counterclaim, OHP claims that, as a result of his
position at OHP, Saye owed OHP a fiduciary duty, which "included
the duty to deal with [OHP] honestly and fairly, to accurately
apprise [OHP] of any situations that could cause its assets to
lose value, to properly manage and account for the value of
assets for which [Saye] had responsibility as portfolio manager,
and to honor the terms of the agreements he entered with OHP."

Saye claims that none of his acts have breached his duty of loyalty or a fiduciary duty to OHP.

The court begins the analysis of these two counts by pointing out that Connecticut law is not clear as to whether there exists a separate cause of action for "breach of duty of loyalty." See Risdon-AMS (USA), Inc. v. Levine, No. CV030181029S, 2004 WL 614518, at *1 (Conn. Super. Ct. Feb. 10, 2004) ("Contrary to the manner in which the plaintiff has organized its complaint, our appellate courts have not explicitly recognized breach of a duty of loyalty as a separate cause of action from breach of fiduciary duty."). At least two decisions from the Connecticut Superior Court have held that there is no such separate cause of action, but that "breach of the duty of loyalty" is simply a subset, or element, of breach of a fiduciary duty. See Esposito v. Connecticut College, No. 543055, 1999 WL 81305, at *3 (Conn. Super. Ct. Feb. 10, 1999) ("This court finds . . . that no separate cause of action exists in Connecticut for breach of the duty of loyalty. [T]he duty of loyalty derives from the prohibition against self-dealing that inheres in the fiduciary relationship. . . . Consequently, a breach of the duty of loyalty by a fiduciary is conduct which may give rise to a breach of fiduciary duty claim. Therefore, the duty of loyalty is actually a subset, or an element of, the breach of a fiduciary duty claim, rather than its own cause of action.") (internal

quotation marks and citations omitted); <u>US Fin. Group, Inc. v.</u>
<u>Salazar</u>, No. CV000339753S, 2002 WL 1009810, at *3-4 (Conn. Super.
Ct. Apr. 23, 2004); <u>but see</u> <u>News Am. Mktg. In-Store, Inc. v.</u>
<u>Marquis</u>, 86 Conn. App. 527, 535 (2004) ("A party may recover for
breach of loyalty in tort."), <u>aff'd</u> 276 Conn. 310 (2005).
Despite, however, the above-quoted language in <u>News Am. Mktg</u>, the
relevant portion of court's decision was not focused on whether a
separate cause of action exists for a breach of the duty of
loyalty, but on whether harm is a necessary element of a cause of
action rising from a breach of the duty of loyalty.  <u>See</u> <u>News Am.</u>
<u>Mktg</u>, 86 Conn. App. at 533-38.  In any event, because the duty of
loyalty is either a subpart under the heading of "fiduciary duty"
or its own separate category of fiduciary duty, it is, at least,
inseparably intertwined with the concept of fiduciary duty, and
thus the court shall discuss the Second and Third Counts
together.

   "It is axiomatic that a party cannot breach a fiduciary duty
to another party unless a fiduciary relationship exists between
them."  <u>Biller Assocs. v. Peterken</u>, 269 Conn. 716, 723 (2004).
Under Connecticut law, "[a] fiduciary or confidential
relationship is characterized by a unique degree of trust and
confidence between the parties, one of whom has superior
knowledge, skill or expertise and is under a duty to represent
the interests of the other."  <u>Sherwood v. Danbury Hosp.</u>, 278

Conn. 163, 195 (2006) (internal quotation marks omitted). "The
superior position of the fiduciary or dominant party affords him
great opportunity for abuse of the confidence reposed in him.
. . .." Id. (internal quotation marks omitted). "The Connecticut
Supreme Court has made clear that a fiduciary is a 'trustee who
must act in scrupulous good faith and candor. . . . [The
fiduciary] must act honestly, and with the finest and undivided
loyalty to the trust.'" Martinelli v. Bridgeport Roman Catholic
Diocesan Corp., 989 F. Supp. 110, 117 (D. Conn. 1997) (quoting
Konover Dev. Corp. v. Zeller, 228 Conn. 206, 220 (1994)).

    "The Supreme Court of Connecticut has 'specifically refused
to define a fiduciary relationship in precise detail and in such
a manner as to exclude new situations, choosing instead to leave
the bars down for situations in which there is a justifiable
trust confided on one side and a resulting superiority and
influence on the other.'" Fenn v. Yale University, 283 F. Supp.
2d 615, 632 (D. Conn. 2003) (quoting Alaimo v. Royer, 188 Conn.
36, 41 (1982)). Still, although Connecticut courts "have not
expressly limited the application of [the] traditional principles
of fiduciary duty to cases involving only fraud, self-dealing or
conflict of interest, the cases in which [they] have invoked them
have involved such deviations." Sherwood, 278 Conn. at 196
(emphasis in original) (internal quotation marks omitted).

    "Once a [fiduciary] relationship is found to exist, the

-44-

burden of proving fair dealing properly shifts to the fiduciary.

. . . Furthermore, the standard of proof for establishing fair

dealing is not the ordinary standard of fair preponderance of the

evidence, but requires proof either by clear and convincing

evidence, clear and satisfactory evidence or clear, convincing

and unequivocal evidence." <u>Cadle Co. v. D'Addario</u>, 268 Conn.

441, 455 (2004) (internal quotation marks omitted).  The

Connecticut Supreme Court has warned, however, that "unless the

allegation involves . . . claims [of fraud, self-dealing or

conflict of interest], the burden [to prove fair dealing by clear

and convincing evidence] does not shift." <u>Murphy v. Wakelee</u>, 247

Conn. 396, 397 (1998).  "[I]t is only when the confidential

relationship is shown together with suspicious circumstances, or

where there is a transaction, contract, or transfer between

persons in a confidential or fiduciary relationship, and where

the dominant party is the beneficiary of the transaction,

contract, or transfer, that the burden shifts to the fiduciary to

prove fair dealing." <u>Id.</u> at 405-06 (internal quotation marks

omitted).

There does not seem to be any dispute that Saye was a

fiduciary of OHP.  Saye was an executive officer at OHP who held

shares in the corporation.  "In Connecticut, . . . officers and

directors have a fiduciary relationship to the corporation and

its investors." <u>S.E.C. v. Global Telecom Servs., L.L.C.</u>, 325 F.

Supp. 2d 94, 117 (D. Conn. 2004) (citing Ostrowski v. Avery, 243
Conn. 355, 363 (1997)). In addition, Saye agreed, via the
Shareholder Agreement, to have a fiduciary responsibility for the
safekeeping and use of OHP's funds and assets. Moreover, based
on Saye's work duties and responsibilities at OHP, which gave him
access to and control over OHP's assets and sensitive
information, it seems clear that Saye had a fiduciary
responsibility to OHP.

Having determined that Saye had this fiduciary duty, the
court must examine whether Saye has breached that duty. The
court points out that some of OHP's allegations against Saye
appear to involve, at least, self-dealing or conflicts of
interest, which would require Saye to prove by clear and
convincing evidence that he did not breach his trust. "The
fiduciary duty comprises two prongs: a duty of care, and a duty
of loyalty. . . . While the duty of care requires that the . . .
fiduciaries exercise their best care and judgment . . . the duty
of loyalty derives from the prohibition against self-dealing that
inheres in the fiduciary relationship." Swift v. Ball, No.
CV010344047S, 2005 WL 648145, at *13 (Conn. Super. Ct. Feb. 22,
2005). As the Connecticut Supreme Court has noted, however,
"[p]rofessional negligence alone . . . does not give rise
automatically to a claim for breach of fiduciary duty. . . .
[Thus] not every instance of professional negligence results in a

breach of [a] fiduciary duty. . . .   Professional negligence implicates a duty of care, while breach of a fiduciary duty implicates a duty of loyalty and honesty." Sherwood, 278 Conn. at 196 (internal quotation marks omitted).

In light of the numerous factual questions involved here, the court cannot grant summary judgment in favor of Saye on the Second and Third Counts.  With regard to Saye's alleged mishandling of the various bonds, the court finds that a finder of fact could determine that Saye breached his duty of loyalty or fiduciary duty.  Saye maintains that he did not mis-mark the FIRBER bond because he followed the OHP's evaluation policies and principles.  Specifically, Saye states that he received a representative price (72) from a broker dealer, Links Securities ("Links") and, consistent with OHP policy, marked the FIRBER bond based on the Links indication.  OHP points out, however, that Saye received representative prices from two other investment firms; one of those firms reported the FIRBER bond as being worth 63 to buy and 68 to sell, whereas the other firm reported the price of the FIRBER bond as being 62.  OHP claims that Saye intentionally ignored OHP's policies by using the higher evaluation.  There is, then, a disputed issue here.  In addition, Saye maintains that his alleged "minimal investigation" into various bonds is unsupported and fails to state a claim for relief.  Again, there is an issue here as to what Saye did with

regard to these bonds and why he did it; Saye claims that he did no wrong, whereas OHP claims that Saye intentionally failed to investigate these bonds with due diligence.

In support of his contentions here, Saye asserts that the court should disregard Howe's testimony and affidavit with regard to OHP's claims. The court finds Saye's arguments regarding Howe's testimony and affidavit to be unpersuasive. First, Saye maintains that OHP has failed to present proof of injury or damages; that is, Saye states that Howe's "bare conclusory statement[s] as to losses," as contained in his testimony and affidavit, are unsupported and inadmissible. Howe, though, is the President, and a shareholder, of OHP. "[Rule] 701 [of the Federal Rules of Evidence] permits a lay witness to testify to an opinion '(a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.'" Securitron Magnalock Corp. v. Schnabolk, 65 F.3d 256, 265 (2d Cir. 1995) (quoting Fed. R. Evid. 701). "Accordingly, a president of a company . . . has personal knowledge of his business . . . sufficient to make . . . [him] eligible under Rule 701 to testify as to how lost profits could be calculated." Id. (internal quotation marks omitted). "A company president certainly is capable of projecting lost profits where the projection is based on evidence of decreased sales." Id. Howe would presumably have

personal knowledge regarding any losses that OHP suffered, and thus his testimony in that regard is admissible.

Second, Saye asserts that, if OHP intends to allege Saye's lack of compliance with industry standards, such a theory must be supported by an expert, not Howe, who has not been identified as an expert for such matters. It is true that if OHP has not offered Howe as an expert pursuant to Fed. R. Evid. 702, he may not opine about the custom and practice in the hedge fund industry. See <u>Didzbalis v. Sheridan Transp. Co.</u>, No. 00 Civ. 4329(JCF), 2002 WL 31619071, at *1 (S.D.N.Y. Nov. 19, 2002) ("Generally, expert testimony is necessary for the introduction of custom and practice evidence.") (collecting Second Circuit cases). Nevertheless, Howe may proffer testimony as the opinion of a lay witness pursuant to Fed. R. Evid. 701. There are limits, however, as to what Howe may testify as a lay witness. "Testimony admitted pursuant to Rule 701 must be rationally based on the perception of the witness." <u>Bank of China, New York Branch v. NBM LLC</u>, 359 F.3d 171, 181 (2d Cir. 2004) (internal quotation marks omitted) (finding that the testimony proffered by one of the plaintiff's employees was proper "so long as [it] was based on the investigation [he conducted] and reflected his investigatory findings and conclusions, and was not rooted exclusively in his expertise in international banking"). "This requirement is the familiar requirement of first-hand knowledge

or observation." <u>United States v. Glenn</u>, 312 F.3d 58, 67 (2d Cir. 2002) (internal quotation marks omitted).

It is not clear, though, that Howe is opining about "custom and practice" of the hedge fund industry in general. In determining the admissibility of a lay witness' opinion testimony, "a witness' experience and specialized knowledge obtained in his or her vocation should certainly be taken into consideration. The fact that the lay opinion testimony bears on the ultimate issue in the case does not render it inadmissible." <u>B & G Plastics, Inc. v. E. Creative Indus., Inc.</u>, No. 98Civ.0884RMBJCF, 2004 WL 307276, at *8 (S.D.N.Y. Feb. 18, 2004). Based on his experience and knowledge gained at OHP, Howe may, for example, testify as to OHP's policies regarding the investigation of assets that OHP is interested in buying. Given that the court must, for the purposes of this motion, construe the facts in a light most favorable to OHP, the court will not exclude the evidence from Howe.

With regard to Saye's other allegedly disloyal conduct, the court finds that there are questions of fact that the court cannot resolve on summary judgment. For example, there are questions about whether and how Saye's discussions with various investors in OHP affected OHP. There are questions as to whether Saye facilitated or encouraged the dissemination of allegedly confidential OHP information to Edington; whether Saye was

disloyal with regard to his treatment of the Luz Solar bonds; and whether Saye, after he left OHP, breached his fiduciary duty by using OHP's alleged trade secrets involving its investment strategies for his own business, Tranquility.[11]  Consequently, with regard to the Second and Third Counts of OHP's Amended Counterclaim, Saye's motion for summary judgment is **DENIED.**

### 3. Fourth Count: CUTSA

In the Fourth Count of the Amended Counterclaim, OHP claims that Saye's conduct violated Connecticut's Uniform Trade Secrets Act ("CUTSA").  Saye responds by claiming that OHP has not made the requisite showing of either the existence of a trade secret or the misappropriation of a trade secret.

"It is undisputed that a plaintiff must establish the existence of a trade secret before he can seek protection under CUTSA."  <u>Dreamcatcher Software Dev., LLC v. Pop Warner Little Scholars, Inc.</u>, 298 F. Supp. 2d 276, 282 (D. Conn. 2004).  CUTSA defines a trade secret as:

information, including a formula, pattern, compilation,

---

[11]The court notes that "[g]enerally speaking, in the absence of a restrictive covenant, a former employee may compete with his or her former employer upon termination of employment." <u>Elm City Cheese Co., Inc. v. Federico</u>, 251 Conn. 59, 69 (1999).  "Even after the employment has ceased, however, the employee remains subject to a duty not to use trade secrets, or other confidential information, which he has acquired in the course of his employment, for his own benefit or that of a competitor to the detriment of his former employer." <u>Id.</u> (internal quotation marks omitted).  Saye had a unique position of trust at OHP, which presumably endowed him with fiduciary responsibilities, and Saye signed the Confidentiality/Non-Compete Agreement, in which he covenanted not to use or disclose OHP's "trade secrets" or confidential information for a period of two years after the termination of his employment.  Saye was therefore not permitted to use such trade secrets, if any, for his own (or for another's) business.

> program, device, method, technique, process, drawing,
> cost data or customer list that: (1) Derives
> independent economic value, actual or potential, from
> not being generally known to, and not being readily
> ascertainable by proper means by, other persons who can
> obtain economic value from its disclosure or use, and
> (2) is the subject of efforts that are reasonable under
> the circumstances to maintain its secrecy.

Conn. Gen. Stat. § 35-51(d). "The three part statutory test for the definition of a trade secret therefore requires that the information: (1) be of the kind included in the nonexhaustive list contained in the statute; (2) be 'of independent economic value'; and (3) 'was the subject of reasonable efforts to maintain its secrecy.'" Dreamcatcher Software, 298 F. Supp. 2d at 282 (quoting Elm City Cheese Co., 251 Conn. at 78).

"An alleged trade secret is not deprived of trade secret status simply because it is comprised of materials that are 'common [and] commercially available.'" Id. (quoting Elm City Cheese Co., 251 Conn. at 74). That is, a "plaintiff's ability to combine these elements into a successful . . . process, like the creation of a recipe from common cooking ingredients, is a trade secret entitled to protection." Elm City Cheese Co., 251 Conn. at 74-75 (internal quotation marks omitted). Finally, and more importantly for purposes of [a summary judgment] motion, whether a particular piece of information is a 'trade secret,' is a question of fact." Dreamcatcher Software, 298 F. Supp. 2d at 282; see Elm City Cheese Co., 251 Conn. at 68 ("The question of whether information sought to be protected by the trade secrets

act rises to the level of a trade secret is 'one of fact for the trial court.'" (quoting Allen Mfg. Co. v. Loika, 145 Conn. 509, 516 (1958))).

The court, having examined the various affidavits, deposition transcripts, and other evidence submitted, finds that there are questions of fact regarding each of the three prongs of the statutory definition of a trade secret. With regard to the first prong, OHP has maintained that its business formula—which includes investment and trading strategy, investor lists, portfolio contents, financing methods, identities of broker-dealers from whom particular fixed-income securities could be purchased, marketing methods, and back-office operations—is unique. Indeed, the terms "formula" and "method" are explicitly mentioned in the statutory definition of a trade secret. See Conn. Gen. Stat. § 35- 51(d).

Saye claims that OHP's "business formula" does not fit under the meaning of "trade secret," as set forth in Elm City Cheese Co., because the holding in that case "was limited by its facts"; as Saye points out, in Elm City Cheese Co., the defendant had tried to duplicate the plaintiff's "unique" business, which had a specialized niche in the cheesemaking industry. Saye maintains that there is no such unique quality to OHP's business, but not everyone agrees with Saye. Of course, Howe and OHP do not agree with Saye. In addition, Wright's deposition testimony indicates

that OHP had a unique business model:

> A.  [T]he reason [OHP] was unique in our portfolio is there weren't a lot of alternatives outside of [OHP] in this specific asset class, and in terms of how they carried out their investment strategy.
>
> Q.  And you can, that is your testimony because you did due diligence to try to find a fund like that, or is it fair to say that after you understood what [OHP's] strategy was, that was your determination?
>
> A.  We screened almost every market neutral hedge fund in the universe of hedge funds.  That was our job to know all of the hedge funds out there.  So as far as our due diligence was, [OHP] was a very unique fund.
>
> . . . .
>
> Q.  Is that your impression of [OHP] say in June of 2004 before you left [Northwater]?
>
> A.  [OHP] is a much more diversified hedge fund today in terms of the strategies that it participates in.
>
> . . . .
>
> Q.  How would you assess the market or the availability of strategies like those employed by [OHP] in 2002?  Your testimony earlier was that in [1998] it certainly was unique.  Did it still retain that distinction in 2002[?] . . .
>
> A.  I think there were more hedge funds that were participating in some sub strategies of Footbridge in 2002 that we didn't find or they didn't exist in 1998.  But in terms of how Footbridge manages its risk, [OHP] manages its risk and how yet, [sic] how it manages to deliver certainty in its portfolios, again it's unique today, it was unique in 2002, as it was in 1998 when we first met John Howe.

(Dkt. # 152, Ex. J, Wright Dep. at 111:2-18; 112:19-24; 114:10-115:4.)  Thus, despite what Saye contends, the affidavits and testimony present a question of fact regarding whether the information that OHP revealed to Saye constitutes a "trade secret."  Put simply, there is at least a question of fact as to whether OHP divulged to Saye the metaphorical "recipe" for OHP's business model, which in turn may be one of the types of trade

secrets expressly provided for in the statute.

With regard to the second prong, namely, whether the
information has independent economic value, the materials
submitted indicate that there is, at least, a question of fact as
to this element.  Obviously, OHP maintains that its business
formula has "independent economic value"; indeed, OHP attributes
its profitability and success to its business formula.  Saye does
not fully address this point in his briefs, but presumably he
would argue that, as OHP does not have a "trade secret," it
cannot have a trade secret with "independent economic value."
There is, however, a question of fact regarding the "trade
secret" issue.  Because Howe and OHP claim that OHP's business
formula is both unique and profitable, there is a question of
fact with regard to the "independent economic value" of that
formula.

Finally, with regard to the third prong, the court finds
that the submitted materials indicate that there are material
questions of fact as to whether OHP took reasonable steps to
ensure the confidentiality of its "trade secret" information.
Saye contends that OHP did not do so, and lists certain events
that may show OHP publically disseminated whatever "trade secret"
information it thought it had.  For example, Saye maintains that
Imperatore wrote an article for an industry publication that was
"written from the perspective of [OHP]," i.e., the article

"described the [OHP] strategy in detail." In addition, Saye claims that OHP divulged its alleged "trade secret" to him before he became an employee of OHP. There is, however, evidence demonstrating that OHP made attempts to ensure the confidentiality of any trade secrets it may have had. The first, and most obvious, piece of evidence is the Confidentiality/Non-Compete Agreement, which Saye was required to sign in order to become an OHP employee. In addition, there are affidavits and deposition testimony indicating that OHP took steps to keep its information confidential. Wright, in his deposition testimony, has told of OHP's efforts in this regard:

> Q. You also, on direct testimony, explained that you were not privy to all of the specific portfolio holdings of [OHP]. Had you ever asked to see the entire portfolio?
> A. I never asked to see the entire portfolio.
> Q. Is that something you would ask of other managers?
> A. Strategy's specific and it's personality specific, too. From my very first phone call with John Howe in [1997] John made it clear to me that he would share information on a need to know basis. That his strategy was proprietary, and how he found and took advantage of trading opportunities was proprietary. And that protected his investors' alpha, because if everybody knows the trade, then everybody's in the trade, and the inefficiency goes away.

(Id. at 111:19-112:14.) In light of the submitted materials, the court finds that there are questions of fact as to whether OHP took reasonable steps to maintain the confidentiality of its allegedly confidential information. The court concludes that there are questions of material fact as to each of the three prongs of the statutory definition of a trade secret.

Consequently, with respect to the CUTSA claims as contained in the Fourth Count of OHP's Amended Counterclaim, Saye's motion for summary judgment is **DENIED.**

### 4. Fifth Count: Tortious Interference with Business Relationship and Expectancies

In the Fifth Count of the Amended Counterclaim, OHP claims that Saye "willfully and maliciously interfered in the relationship between [OHP] and its investors and marketers for his own financial gain and/or to harm [OHP's] business." Saye's response here parallels his response to the allegation that he violated the provisions of the Confidentiality/Non-Compete Agreement that prohibited Saye from materially disrupting, damaging, impairing, or interfering with OHP's business.

"It is well established that the elements of a claim for tortious interference with business expectancies are: (1) a business relationship between the plaintiff and another party; (2) the defendant's intentional interference with the business relationship while knowing of the relationship; and (3) as a result of the interference, the plaintiff suffers actual loss." Hi-Ho Tower, Inc. v. Com-Tronics. Inc., 255 Conn. 20, 27 (2000). "'[I]t is not essential . . . [to a cause of action for tortious interference with a business expectancy] that . . . the tort . . . [result] in a breach of contract to the detriment of the plaintiff.'" Dreamcatcher Software, 298 F. Supp. 2d at 287 (quoting Goldman v. Feinberg, 130 Conn. 671, 674 (1944)).

-57-

"Nevertheless, a plaintiff may [not] recover for an interference with a mere possibility of his making a profit." Id. That is to say, "the plaintiff [must] suffer[] actual loss." Hi-Ho Tower, Inc., 255 Conn. at 33. "In other words, 'it is essential to a cause of action for unlawful interference with business that it appear that, except for the tortious interference of the defendant, there was a reasonable probability that the plaintiff would have entered into a contract or made a profit.'" Dreamcatcher Software, 298 F. Supp. 2d at 287 (quoting Goldman, 130 Conn. at 675).

The court finds that summary judgment is inappropriate for this claim for the same reasons that it was inappropriate for the claim that Saye allegedly violated the provisions of the Confidentiality/Non-Compete Agreement that prohibited Saye from materially disrupting, damaging, impairing, or interfering with OHP's business. The facts that apply to OHP's breach of contract claims also apply to OHP's common law tort claim, see supra Part II.C.1, and the court need not repeat these facts in full here. The court finds that, regarding Saye's involvement with Rimrock and Saye's conduct with Wright, Berg, or Hamilton, there are sufficient factual questions to preclude summary judgment. Consequently, with regard to the Fifth Count of OHP's Amended Counterclaim, Saye's motion for summary judgment is **DENIED.**

## 5. Sixth Count: CUTPA

In the Fifth Count of the Amended Counterclaim, OHP claims that Saye violated Connecticut's Unfair Trade Practices Act by "engag[ing] in unfair and deceptive conduct."  As evidenced by Saye's Complaint, Saye, for his part, claims that OHP, not he, violated CUTPA.

The court has already set forth the standard for a CUTPA claim, see supra Part II.B.3, and will not repeat it here.  The many factual issues at play in this case, which the court has already discussed and need not narrate again, preclude summary judgment here.  Saye's alleged conduct, whether it be his marking of bonds, his transactions with Rimrock, or his dealings with various investors of OHP, raises factual issues.  Quite simply, there are questions of fact as to whether Saye, both during and after his employment with OHP, engaged in unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce that offended public policy or the common law, were immoral, unethical, oppressive, or unscrupulous, and caused substantial injury to consumers, competitors, or other businesspersons.  Consequently, with regard to the Sixth Count of OHP's Amended Counterclaim, Saye's motion for summary judgment is **DENIED**.

## 6. Seventh Count: Constructive Trust

In the Fifth Count of the Amended Counterclaim, OHP claims

that, because Saye's conduct directly violated both the
Shareholder Agreement and the Confidentiality/Non-Compete
Agreement, and exploited confidential information to earn profits
for Saye's own ventures, any gains or profits Saye earned in his
own ventures are subject to a trust in favor of OHP.

The Connecticut courts have described the nature of a
constructive trust as follows:

> A constructive trust arises contrary to intention and
> in invitum, against one who, by fraud, actual or
> constructive, by duress or abuse of confidence, by
> commission of wrong, or by any form of unconscionable
> conduct, artifice, concealment, or questionable means,
> or who in any way against equity and good conscience,
> either has obtained or holds the legal right to
> property which he ought not, in equity and good
> conscience, hold and enjoy. . . . A constructive trust
> arises whenever another's property has been wrongfully
> appropriated and converted into a different form . . .
> [or] when a person who holds title to property is
> subject to an equitable duty to convey it to another on
> the ground that he would be unjustly enriched if he
> were permitted to retain it.

Stornaweye Props., Inc. v. O'Brien, 94 Conn. App. 170, 175-76
(2006) (internal quotation marks omitted). "The issue raised by
a claim for a constructive trust is, in essence, whether a party
has committed actual or constructive fraud or whether he or she
has been unjustly enriched." Id. at 176 (internal quotation
marks omitted). "The imposition of a constructive trust by
equity is a remedial device designed to prevent [such] unjust
enrichment." Giulietti v. Giulietti, 65 Conn. App. 813, 856
(2001) (internal quotation marks omitted).

Saye does not specifically argue that summary judgment should be granted with regard OHP's constructive trust claim. One can infer from Saye's submissions that Saye believes he has committed no wrongdoing which would necessitate the imposition of a constructive trust. As the court has stated above, though, there are factual questions regarding Saye's alleged conduct, and Saye has not shown that, as a matter of law, a constructive trust cannot be imposed here. Consequently, with regard to the Seventh Count of OHP's Amended Counterclaim, Saye's motion for summary judgment is **DENIED.**

### 7. Affirmative Defenses

Saye also asks the court to strike the second and third of OHP's affirmative defenses. OHP's second affirmative defense states that, because Saye violated the Confidentiality/Non-Compete Agreement, he is not entitled to the remedies he seeks pursuant to the Shareholder Agreement. OHP's third affirmative defense states that Saye violated the Confidentiality/Non-Compete Agreement, and "there has been a failure of consideration with regard to any transfer of shares to [Saye] and with regard to the alleged granting of an option in favor of [Saye]." The court notes that, while Saye's motion is presented as a motion for summary judgment under Rule 56, to the extent that it seeks to strike a pleading, it is more appropriately construed as a Rule 12(f) motion to strike.

"Motions to strike are a severe remedy, and as such are generally disfavored." Sender v. Mann, 423 F. Supp. 2d 1155, 1163 (D. Colo. 2006). Nonetheless, this remedy is "within the district court's sound discretion." F.D.I.C. v. Raffa, 935 F. Supp. 119, 123 (D. Conn. 1995). "An affirmative defense is insufficient if, as a matter of law, the defense cannot succeed under any circumstance." Id.

Saye requests that the court strike OHP's affirmative defenses "to the extent that they mirror the counterclaim allegations." The court, however, has granted summary judgment in favor of Saye with respect to only one portion of one of the counts in OHP's counterclaim. With regard to the bulk of the allegations in OHP's counterclaim, the court finds there to be genuine issues of material fact. It is not clear, then, that the entirety of these affirmative defenses must fail as a matter of law. Thus, the court strikes only those portions of OHP's affirmative defenses that are based upon Saye's alleged violation of the non-compete covenant in the Confidentiality/Non-Compete Agreement. The court shall not strike the affirmative defenses on the ground that they have no legal or factual support at all.

Insofar as Saye implies that the affirmative defenses, by being repetitious or redundant, "mirror" the allegations in the counterclaim, the court also grants Saye's motion only with regard to Saye's alleged violation of the non-compete covenant in

the Confidentiality/Non-Compete Agreement.  It is not clear to
the court that the affirmative defenses merely restate the
allegations in the counterclaim.  OHP's affirmative defenses
provide reasons for which Saye is not entitled to the relief he
seeks under the Shareholder Agreement or the
Confidentiality/Non-Compete Agreement, whereas the allegations in
OHP's counterclaim state why OHP is entitled to relief on account
of Saye's alleged wrongdoing.  Yet, even if the affirmative
defenses were somewhat redundant, the court is not necessarily
required to strike them on that account.  "[R]edundant
allegations need not be stricken if their presence in the
pleading cannot prejudice the adverse party."  Sender, 423 F.
Supp. 2d 1164 (internal quotation marks omitted).  With regard to
OHP's counterclaim, the court has granted Saye's motion for
summary judgment only with respect to OHP's assertion that Saye
violated the non-compete covenant in the
Confidentiality/Non-Compete Agreement by performing services for
Rimrock.  The court has denied most of Saye's requests for
summary judgment, and the court fails to see how the presence of
the surviving portions of OHP's affirmative defenses prejudices
Saye.  Consequently, with regard to the OHP's second and third
affirmative defenses, Saye's motion to strike is **GRANTED** only as
to those portions of OHP's affirmative defenses that are based
upon Saye's alleged violation of the non-compete covenant in the

Confidentiality/Non-Compete Agreement, and **DENIED** in all other respects.

### III. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment **(dkt. # 136)** is **DENIED,** and Plaintiff's Motion for Summary Judgment Dismissing Defendant's Counterclaim and Striking Affirmative Defenses **(dkt. # 141)** is **(1) GRANTED only with respect to the portion of the First Count of OHP's Amended counterclaim and those portions of OHP's second and third affirmative defenses that are based upon Saye's alleged violation of the non-compete covenant in the Confidentiality/Non-Compete Agreement; and (2) DENIED in all other respects.  The parties shall file a joint trial memorandum on or before May 7, 2007.**

**SO ORDERED** this <u>12th</u> day of March, 2007.

<u>            /s/DJS            </u>

**DOMINIC J. SQUATRITO**
**UNITED STATES DISTRICT JUDGE**